**Kevin McCARTHY, Trustee in Bankruptcy for Builders International (Senegal) S.A.\***

v.

**The UNITED STATES.**

No. 235–76.

United States Court of Claims.

Jan. 27, 1982.

As Amended Feb. 19, 1982.

\* The trustee in bankruptcy was substituted as plaintiff December 4, 1981, shortly following oral argument.

John Vanderstar, Washington, D. C., attorney of record, for plaintiff. Corinne Goldstein and Covington & Burling, Washington, D. C., of counsel.

Alexander Younger, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant. Michael G. Kitay, Asst. Gen. Counsel, Washington, D. C., Agency for International Development, of counsel.

Before COWEN, Senior Judge, and NICHOLS and KASHIWA,** Judges.

## OPINION
PER CURIAM:

This case comes before the court on defendant's exceptions to the opinion, findings, and conclusion of law of Trial Judge Hogenson, submitted by him after trial in accordance with Rule 134(h). The exceptions to the fact findings and proposed substitute findings are all overruled as either irrelevant or contrary to the evidence. Upon consideration of the briefs and oral argument, the court agrees with the trial judge that the court has jurisdiction and the defense and counterclaim of fraud were not sustained by the evidence. Defendant's fraud case was that certain evidence offered by plaintiff to the arbitrators was false and fraudulent. Contrary to defendant's present argument, the trial judge understood this and did not suppose the fraud was in any other context. Therefore, we adopt the opinion, findings, and conclusion of law as our own, with some modifications

** The concurring opinion of Judge Kashiwa follows the trial judge's opinion which, as modified, has been adopted by the court.

in the opinion as the basis for our judgment. Plaintiff is entitled to recover and judgment is entered for plaintiff in the amount of $495,898.45 plus 75 percent of the costs of arbitration. Defendant's counterclaim is dismissed. The findings are not printed as they have been furnished to the parties. The opinion of Trial Judge Hogenson, as modified follows:

HOGENSON, *Trial Judge*: Plaintiff, a corporation organized under the laws of the Republic of Senegal, brought this suit to recover on an arbitration award, thereafter amending its petition for a money judgment pursuant to an order of the court. The arbitration proceedings had been instituted according to the terms of a contract between plaintiff and the defendant's Agency for International Development in an attempt to resolve a dispute arising under that contract.

In March 1965 two American businessmen, Robert F. Lusher and Ezra Cornell IV, traveled to Senegal with an official of the Agency for International Development (AID) for the purpose of determining whether it would be feasible to construct a large housing project there under an investment guaranty program administered by AID. After deciding that the project could be constructed in Dakar, Lusher organized a Delaware corporation, Builders International, Inc. (Builders Delaware), as the vehicle for conducting the initial preparations.[1]

In 1967 Lusher and Cornell organized a Senegalese corporation, Builders International (Senegal) S.A., (Builders), with nominal capital to carry on the actual construction of the project.

The housing project, know as "Patte d'Oie," was planned to include approximately 800 units as well as a sewage treatment plant, roads, and electrical and water distribution systems. The project was planned, financed, and constructed according to the conditions of a program administered by

1. Lusher's wife was also a part-owner of Builders Delaware. At the time of the arbitration, the corporation remained in existence though it had become essentially dormant.

AID pursuant to the Foreign Assistance Act of 1961. Under this program AID would guaranty loans made by private investors who agreed to provide permanent financing to Senegalese citizens who purchased the houses Builders constructed. Builders in turn would give AID the right of approval over the plans and specifications of the project. Builders would secure its own construction loans.

As part of the application for the program, Builders submitted detailed cost estimates for the project in 1967 and 1968. These estimates contained a breakdown of the items used in constructing the several types of houses and indicated the quantity of items needed, the unit price, and the total price. After AID approved the project, Builders entered into contracts with AID and with third parties to provide for the financing and construction of the project. In this case two insurance companies, the investors, agreed to provide Builders with up to $5 million in guaranteed loans to finance the project. In return, AID entered into a "Contract of Guaranty" with the investors under which AID obligated itself to repay any losses incurred by the investors on their loans to Builders. In addition, on June 1, 1968, Builders Senegal and the Government of Senegal entered into a separate contract with AID known as the "Company Agreement," which gave AID control over certain of the financial and planning decisions pertaining to the project. Pursuant to this agreement, Builders could not increase the sales prices without AID's prior approval and AID reserved the right to approve the plans and specifications of the houses, as well as the time at which Builders could commence construction. The agreement further provided that AID would be obliged to consider requests to increase the sale prices of the houses only in certain circumstances. If AID were to require changes in the construction plans, however, Builders would be entitled to reflect any consequent cost increases in the selling prices. In the event that any dispute relating to the agreement were to arise, the parties agreed to resolve it through arbitration.

On June 20, 1968, Builders engaged Enterprises Generale du Cap Vert de Travaux Publics et Particulars Batiments (EGCAP) to be the general contractor for the Patte d'Oie Project. The contract documents included several "devis estimatifs" prepared by EGCAP, which were cost breakdowns of the total house price into items of construction. Each item listed in the devis estimatifs was accompanied by a stated unit of measurement, a unit price, quantity, and total price. The total cost of construction for a B–3 house in the 1968 devis estimatif was subsequently reduced in reaching the contract price.[2]

EGCAP commenced initial operations to clear the site that same month and began constructing the houses in late November or early December 1968. In constructing the individual houses, Builders employed a method known as a steel-frame system. This method involved the use of steel trusses and steel laths to form a frame to which cement or plaster could be applied. AID approved the use of this system in the project although the Federal Housing Authority (FHA) had informed AID earlier that it had some reservations about the system. Sometime before the actual construction began Builders received word from FHA that a contractor employing a method similar to the steel-frame system on a project in Puerto Rico had experienced some difficulties with it. On the basis of this report AID subsequently decided to review the use of the steel-frame system by Builders. In December 1968 two officials from FHA went to Dakar to evaluate the steel-frame system. These officials informed Builders that a number of changes would have to be made in the plans and specifications of the project and, in addition, recommended to AID that Builders be required to switch from the steel-frame system to a conventional method of construction.

---

**2.** The project included a number of different types of houses, each designated with a letter and a number. The parties have agreed that the B–3 type of house would be representative of all other house types for the purpose of this litigation.

At this time Builders had made substantial progress on the construction of the 26 houses that comprised the first section of the project but had done only preliminary work on the other sections. On December 23, 1968, officials of AID met at their Washington office with Mr. Harrison Chapman, Builders' construction consultant, and informed him that Builders could no longer use the steel-frame system on the Patte d'Oie Project. By letter dated January 8, 1969, Mr. George Hazel of AID ordered Builders to change to a conventional method of construction for all but the first 26 units in the project. As a result of this order, Builders was forced to halt construction after completing the first section of houses. In addition, Builders was required to submit to AID and FHA new plans and cost estimates for completing the project with a conventional method of construction. When it became apparent that conventional methods would be prohibitively costly, AID, in March 1969, allowed Builders to resume construction with the steel-frame system. · AID's approval, however, was subject to the condition that Builders make a substantial number of changes in the system.

During March 1969 Builders prepared revised plans and specifications for the remaining sections of the project in order to comply with the changes AID had ordered. After AID had approved the new plans Builders delivered them to EGCAP to obtain new devis estimatifs for the project. In order to implement the changes, Builders was forced to reopen and modify its construction contract with EGCAP. EGCAP took advantage of this opportunity to recost the project and to correct errors that it had made in the 1968 devis estimatifs. Subsequently, on April 9, 1969, EGCAP provided Builders with revised devis estimatifs to

reflect what it anticipated it would cost to complete the project. EGCAP's total cost for a B–3 house increased in the 1969 devis estimatif by approximately $148 over the cost in the 1968 devis and by approximately $632 over the contract price.[3] For most of those items that appeared on both the 1968 and 1969 devis estimatifs EGCAP did not raise the 1969 unit prices over those that appeared on the 1968 devis estimatifs. On the 1969 devis EGCAP had, however, corrected mathematical errors that had been made in the 1968 devis and had increased the quantity of some items used.

After receiving the 1969 devis estimatifs Builders negotiated with EGCAP and agreed on a new lump-sum price for which EGCAP would construct the remainder of the houses. The parties did not reduce the terms of the new price agreement to writing. Instead, they continued construction of the project on the basis of an oral agreement according to which EGCAP was to receive a total sum for each type of house it completed. In reaching this agreement the parties concentrated on determining the total bottomline cost of construction for each house type and did not attempt to establish an item-by-item breakdown of the costs involved as they had done previously.

Having reached an agreement with EGCAP regarding the cost of completing the project, on April 30, 1969, Builders requested AID's approval for increases in the sales prices. Builders sought the increased prices in order to reflect the increased costs that it had incurred in implementing the changes AID had ordered, as well as to offset increased costs it had experienced for land, construction, urbanization, and other overhead costs. Together with the April 30, 1969 request for a price increase Builders submitted to AID new cost estimates which

---

**3.** The total figure for a B–3 house in the 1968 devis estimatif was 1,082,145 c. f. a. (Senegalese francs). The contract price for a B–3 house was 961,087 c. f. a. The total in the 1969 devis was 1,118,947 c. f. a. Because the rate of exchange fluctuated substantially over the life of the project, it is not completely accurate to use the same conversion rate for the 1968 and 1969 figures. Nonetheless, for convenience the parties have used a conversion rate of 250 francs per dollar in the past. The conversion of the totals on the devis estimatifs into dollars is based on this ratio and the figures obtained are necessarily approximations. Thus, the total on the 1968 devis becomes $4,328. The contract price becomes $3,844 and the total on the 1969 devis becomes $4,476. The increase in the 1969 devis over the 1968 devis is approximately $148, while the increase over the actual contract price is approximately $632.

incorporated the increases it had incurred in its contract with EGCAP, as well as other cost increases not within the EGCAP contract, and a contingency factor of 8 to 10 percent of its costs. The total cost for a B–3 house in the April 30, 1969 estimates was $5,394.96. This represented an increase of $1,357.01 over Builders' 1967 estimate of $4,037.95 and an increase of $1,466.17 over the 1968 estimate of $3,928.79 for the same type of house.

Builders had sought to increase the sales price by approximately 55 percent of the original cost. AID orally conveyed to Builders its approval of a small price increase on October 1, 1969, and confirmed the increase in writing on November 12, 1969. The approved increase amounted to approximately 5 percent of the original cost of the project. Builders began to sell houses at the new prices in November 1969 and substantially completed the project by December 1970, the agreed completion date. At that time it had constructed and sold 669 houses and had suffered a financial loss on the project, which ended in insolvency and foreclosure proceedings.

In February 1973 Builders submitted a request for arbitration pursuant to § 5.01 of the Company Agreement. Builders sought damages for AID's alleged failure to allow Builders to increase its sales prices to reflect the higher costs it incurred as a result of the changes AID had made in the steel-frame system. As Builders was preparing for arbitration, Lusher asked Chapman to join him in Hong Kong as an employee of Builders Federal, a construction company operating in Hong Kong in which Lusher held an interest, and to assist in preparing Builders Senegal's case. Chapman had no employment contract for this work, but Lusher promised to pay him $50,000 from the arbitration award if it was favorable to Builders.

After conducting extensive hearings, the arbitration panel determined that the United States had breached the Company Agreement and awarded Builders $495,898.45 plus 75 percent of the costs of arbitration. Because this was less than he expected to receive, Lusher informed Chapman that he would not be able to pay him $50,000. Chapman thereafter threatened to tell the FBI that Builders had presented false evidence to the arbitration tribunal if he did not receive the $50,000.

In October 1976 Builders, by amended petition, asked this court for a money judgment against the United States in an amount equal to the arbitration award.[4] In April 1977 Mr. Chapman contacted the FBI and informed them that he, Mr. Cornell, and Mr. Lusher had presented false evidence in support of Builders' claim at the arbitration hearing. Subsequently, the defendant set up a special plea of fraud in its answer alleging that Builders had violated 28 U.S.C. § 2514 (1976) at the arbitration by knowingly claiming that EGCAP had increased its unit costs when in fact it had not. The defendant also filed a counterclaim alleging that Builders had submitted a false claim in violation of 31 U.S.C. § 231 (1976).

At trial the defendant admitted that absent fraud it was bound to pay the arbitration award. The sole issues at trial, therefore, were whether Builders had in fact corruptly practiced fraud against the government or had submitted a false claim. The government has alleged that the April 30, 1969 cost estimates greatly exceeded the amount of an increase that could be justified solely by the cost increases Builders had experienced on the project. The government has argued that Builders arbitrarily inflated its costs so that it could induce AID to grant a correspondingly larger increase in the sales prices, thereby increasing Builders' profits or reducing its losses. In support of its position the government has relied on the devis estimatifs and the cost estimates as well as the testimony of Mr. Chapman that Builders had arbitrarily selected figures to misrepre-

---

**4.** Builders had first sought an order confirming the award in the District Court for the District of Columbia. That court ruled that it lacked jurisdiction and transferred the case to this court.

sent its costs on the 1969 estimates. Mr. Lusher and Mr. Cornell also testified at trial and essentially contradicted Mr. Chapman's testimony that Builders had fraudulently compiled the 1969 estimates.

The initial question to be considered is whether this court has jurisdiction to hear the plaintiff's claim. The defendant argues that the jurisdiction conferred on this court by the Tucker Act, 28 U.S.C. § 1491 (1976), does not extend to this controversy because the contract on which plaintiff's claim is based is not one that could obligate funds appropriated to AID under the investment guaranty program.

■ Defendant's first point here is that the program was to be financed by fees to be paid for the loan guarantees. It was to be run without imposition of any monetary burden upon appropriated funds. Defendant asserts the law to be that there is a nonappropriated fund exclusion from the jurisdiction of this court, by which claims under the contracts of any activity supported by funds from other than congressional appropriations are not included in the consent to suit given in the Tucker Act, 28 U.S.C. § 1491. It is true that judgments of this court must be paid from appropriated funds. 28 U.S.C. § 2517. Too sweeping conclusions cannot be drawn from this in view of the fact that our judgments, when awarded against the United States, are normally payable not from appropriations to maintain the agency that incurred the liability, but from appropriations made for the purpose of paying Court of Claims and other court judgments, now normally standing appropriations. 31 U.S.C. § 724a; *see Temoak Band of Western Shoshone Indians v. United States*, 219 Ct.Cl. 346, 355, 593 F.2d 994, 998–99 (1979); *Ellis v. United States*, 228 Ct.Cl. ——, 657 F.2d 1178 (1981). Defendant unsuccessfully argued the identical jurisdictional defense urged here in the recent case of *L'Enfant Plaza Properties, Inc. v. United States*, Ct.Cl., 668 F.2d 1211 (1982). As the court there clearly spells out, the nonappropriated funds exclusion is limited to instances when, by law, appropriated funds not only are not used to fund the

agency, but could not be. That case involves a contract of the Comptroller of Currency, whose office is normally funded by fees, just as here. The opinion cites all the most recent and relevant cases and it would be useless to repeat here what is well said there. We have no doubt that AID has authority to use appropriated funds if and to the extent appropriated, and that is sufficient to avoid the nonappropriated funds exclusion. *See* 22 U.S.C. § 2182(f) (1964) now § 2183(e); *G. L. Christian & Associates v. United States*, 160 Ct.Cl. 1, 14, 312 F.2d 418, 425, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963).

■ Defendant rightly shows that Congress intended the "risk guarantee" it authorized to flow to the lenders, the "institutional investors," not the builders. However, we have before us a valid, authorized contract with a builder. It exacted certain obligations from the builder, the purpose being to obtain some handle to prevent him enhancing the risk of liability to the lenders. In return, by the very able and sound decision of the arbitrators, the United States incurred express and implied obligations to the builder. These it breached, as they held, by its unauthorized stop order which suspended work for a costly period, and by delay in approving adjustments in the selling prices of the houses needed to cover the cost increases it had caused, until most houses had been sold at the lower prices. There is nothing in this outside our usual and normal contract jurisdiction. Congress did not contemplate risk guarantees to the builders, but the liability asserted by the arbitrators is not in the nature of a risk guarantee. It is a straight, clear-cut liability for a breach. The arbitrators were careful to respect the rules limiting contract enforcement against the United States Government. We therefore reject the challenge to our jurisdiction defendant here makes.

As part of the Foreign Assistance Act of 1961, (the Act) Congress authorized the President to issue guaranties to eligible investors for financing the construction of housing projects in less-developed friendly

countries.[5] The Foreign Assistance Act of 1961, Pub.L.No. 87–195, § 221, 75 Stat. 424 (1961) (current version at 22 U.S.C. § 2181 (1976)). Congress included the guaranty provision in the Act in order to "facilitate and increase the participation of private enterprise" in the economic development of these countries. The Act originally provided that the President was to administer the program under broad criteria, that each project was to be approved by him, and that he was to make "suitable arrangements" to protect the interests of the federal government with respect to any guaranties issued. The President also was given the authority to "make and perform agreements and contracts with, or enter into other transactions with, any individual, corporation, or other body of persons, * * * whether within or without the United States * * * in furtherance of the purposes and within the limitations of this Act." Id., § 635(b) (current version at 22 U.S.C. § 2395(b) (1976)). By an executive order, the President subsequently delegated to the Secretary of State the authority vested in the President by the Act and ordered the Secretary to establish within the department the Agency for International Development (AID).

In the present case, the United States, acting through AID, entered into separate contracts of guaranty with the two insurance companies that had provided the capital investment to finance the Senegal project. As consideration for AID's entering into the contracts of guaranty, Builders and the Government of Senegal entered into the Company Agreement with AID which provided that Builders would be liable to AID for the full amount of any payments AID might make under the contracts of guaranty that were due to the fault of Builders. Builders also agreed not to begin construction without obtaining the approval of AID, and granted to AID the right to approve the plans, specifications, and selling prices of the houses. The agreement further provided that Builders could request increases in the sales prices only for certain reasons. If AID were to require Builders to change the plans and specifications of the project, however, it was obliged to allow Builders to reflect the consequential cost increases in the selling prices of the houses affected by the change.

■ It is evident from its terms that the Company Agreement is incidental to the contracts of guaranty previously entered into between AID and the investors. The degree of control conferred on AID over the particular construction and financial aspects of the project indicates that the agreement was intended to prevent AID from incurring any liability under the contracts of guaranty by ensuring that Builders would plan, construct, and sell the houses in a manner that did not jeopardize the private investment. Such a contract helps make the guaranty program more fiscally sound, thereby furthering the professed purpose of the Act to assist less-developed countries in providing their people with decent housing. As such, the contract was within the statutory authority of the President to make contracts "in furtherance of the purposes" of the Act. 22 U.S.C. § 2395(b) (1976).

■ In its counterclaim the defendant contends that Builders violated 28 U.S.C. § 2514 (1976) by corruptly practicing fraud against the United States in the statement and proof of its claim at the arbitration and at trial. Section 2514 provides in part that: "[a] claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof." For this court to order a forfeiture pursuant to § 2514, the government must show by clear and convincing evidence that the claimant has corruptly committed the fraud alleged.

5. As enacted, the statute provided that the guaranties could be issued "in connection with projects, including expansion, modernization, or development of existing enterprises, in any friendly country or area." The statute currently provides that the President may issue guaranties for "financing the construction of self-liquidating housing projects and related community facilities." 22 U.S.C. § 2181 (1976).

*Miller v. United States,* 213 Ct.Cl. 59, 68, 550 F.2d 17, 22 (1977); *Law v. United States,* 195 Ct.Cl. 370, 440–41 (1971). The requirement that the fraud be corruptly practiced imposes on the government the obligation to prove that the plaintiff knew the claim to be false and intended to deceive the government by submitting it. *Miller v. United States,* 213 Ct.Cl. at 68, 550 F.2d at 22; *Law v. United States,* 195 Ct.Cl. at 441; *see Acme Process Equipment Co. v. United States,* 171 Ct.Cl. 324, 352–53, 347 F.2d 509, 526 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966).

At trial, the evidence introduced in support of defendant's fraud counterclaim consisted of Mr. Chapman's testimony that Builders had arbitrarily inflated its cost estimates and documentary evidence of alleged discrepancies between Builders' 1969 estimates and EGCAP's 1969 devis estimatifs. In determining whether the defendant has met its burden of proof, a basic issue is the weight to be accorded to Chapman's testimony. This testimony is the only evidence directly showing that Lusher and Cornell intended to defraud the United States by manipulating the construction costs.

Chapman testified at trial that he, Lusher, and Cornell falsified the April 30, 1969, cost estimates by increasing the unit prices of several items when there were few, if any, increases in EGCAP's unit prices. Chapman further stated that each of them knew that the total price increase requested was more than their actual cost increases would justify, and, furthermore, that they intended to conceal the fraud by not giving the government officials copies of EGCAP's 1969 devis estimatifs. According to Chapman's testimony at trial, Builders subsequently presented this false evidence at the arbitration hearing in order to support its claim that the increased prices were justified as a direct consequence of the changes imposed by AID. Chapman stated to this court that he had lied to the arbitration tribunal and that his prior testimony had been part of a scenario established by Lusher, Cornell, and himself to present perjured testimony in support of the false figures submitted in the 1969 cost estimates.

■ The reason Chapman changed his testimony is clear: as he stated at trial, he believed that Lusher had cheated him and he wanted revenge. Lusher did not pay Chapman $50,000 that he had promised him for assisting in the preparation of Builders' case at the arbitration hearing. In addition, several months before Chapman told the FBI that Builders had submitted false evidence at the arbitration hearing he had been discharged by Lusher from his employment with Builders Federal. Chapman's son was also discharged by Builders Federal a short time later. Given the apparent enmity that existed between Chapman and Lusher toward the end of Chapman's employment with Builders Federal, as well as Chapman's desire to seek revenge, and his demeanor on the witness stand, it is impossible to attach much weight to his testimony. Standing alone, his testimony that Lusher and Cornell deliberately falsified the April 30, 1969 cost estimates with the intention of defrauding the government falls far short of the clear and convincing evidence that must be produced to support a forfeiture pursuant to 28 U.S.C. § 2514 (1976).

With regard to the forfeiture issue, the pertinent question becomes whether the documentary evidence produced at trial, either alone or in conjunction with Chapman's testimony, is sufficient to show that the claim was false and that Builders' officers intended to defraud the government by submitting it. In prior cases this court has found a violation of § 2514 by relying primarily on documentary evidence alone. In *O'Brien Gear & Machine Co. v. United States,* 219 Ct.Cl. 187, 591 F.2d 666 (1979), the plaintiff's books included unsupported entries, inconsistencies in its checking account, and a lack of supporting documentation in its cash and bank accounts. *Id.* at 194, 591 F.2d at 669. In addition, plaintiff's office manager gave credible testimony that the owner of the company and another employee had carried on a scheme of mak-

ing out and endorsing checks in pencil to obtain the cash and later inserting the name of one of plaintiff's suppliers as payee, stamping the check with a counterfeit endorsement, and typing up false invoices to substantiate the purported payment to the supplier. *Id.* at 192–93, 591 F.2d at 669. The court found the forged checks to constitute clear and convincing evidence of false entries of costs submitted in an attempt to understate the company's profits and ordered plaintiff's claim forfeited. *Id.* at 199, 216, 591 F.2d at 672, 682.

In *Kamen Soap Products Co. v. United States*, 129 Ct.Cl. 619, 124 F.Supp. 608 (1954), this court also ordered a forfeiture of the plaintiff's claim primarily because several documents submitted in support of the claim were contrary to the established facts. *Id.* at 644, 124 F.Supp. at 621–22. The evidence adduced at trial showed that the documents, which were said to have been prepared in the course of plaintiff's business during 1947, were actually printed on forms not used by plaintiff until 1949, and came to light only after the plaintiff had received notice that the previously submitted documents did not support its claim. *Id.* at 641–42, 124 F.Supp. at 620. The court found it unlikely that the documents were genuine, and that being the case, their use at trial constituted clear and convincing evidence of fraud in violation of § 2514.

In each of these cases there was little doubt that the documents submitted by the plaintiffs were not what they were alleged to be. Microfilm records indicated that the checks made out to the plaintiff's supplier in *O'Brien* had been forged and an analysis of the paper on which the documents in *Kamen Soap* were written showed that they could not have been prepared at the time the plaintiff contended. In the present case, although there are inconsistencies between the unit prices in EGCAP's 1969 devis estimatif and Builders' 1969 estimate, they do not possess the same indicia of fraud as was present in either *O'Brien* or *Kamen Soap.*

Here, the inconsistencies alleged to show the fraud are found in Builders' April 30,

1969 cost estimates. There are a number of items in these estimates for which the unit prices increased over the previous estimates despite the absence of a corresponding increase in the unit prices for the same items in EGCAP's April 1969 devis estimatif. Among the items that showed increases were: the "Double Louvre Door Latch Set," which increased by $3.00; the concrete perimeter footings and interior concrete footings both of whose unit prices increased by $3.10; a mirror and shelf, which increased $2.10, and a Turkish water closet, which increased $7.50 over the 1968 cost estimate. In addition, the 1969 cost estimate contained decreases for the unit prices of some other items, which were considerably smaller than any of the increases. The defendant alleges that Builders "backed into" the unit prices on its 1969 estimates by first determining a total cost it desired for each type house and then manipulating the unit prices to support the total. Builders contends, however, that the increases were made in good faith after it and EGCAP had agreed to a "bottom-line" cost for house construction and had included other "hard costs" not in the devis estimatif, as well as a contingency factor. Builders further asserts that the variances were due to its emphasis on total costs rather than unit prices and that there was no fraud.

■ After having reviewed the cost estimates and the devis estimatifs, it is impossible to find that they provide clear and convincing evidence of fraud. In the absence of additional credible evidence of intent and the falseness of the estimates, the defendant simply has not proven a violation of § 2514. Chapman's testimony on this matter is not sufficiently persuasive. What the documents do show clear and convincingly is that following the reopening of the contract with EGCAP, Builders was forced to draft the 1969 revised estimates in a manner that differed from that used in preparing the 1967 and 1968 cost estimates. In 1969 Builders agreed with EGCAP on a total price for constructing the houses and then used this lump-sum figure in preparing its revised cost estimates. In preparing

the estimates Builders allocated its increased costs and the contingency factor among the individual items and adjusted the unit prices in order to obtain what it perceived as a fair representation of its costs. That the unit prices in Builders' 1969 estimate do not correspond to the unit prices in EGCAP's 1969 devis estimatif is not unusual given the manner in which Builders and EGCAP reached an agreement on the total cost of construction for the houses. Though the unit prices did increase on the 1969 estimates while those on the devis estimatif remained the same, such a discrepancy, either alone or in conjunction with Chapman's testimony, does not prove by clear and convincing evidence that Builders violated 28 U.S.C. § 2514 (1976).

The defendant next contends that Builders is liable to the United States in the amount of $2,000 for making a false claim in violation of 31 U.S.C. § 231 (1976), the False Claims Act. That section provides that "[a]ny person * * * who shall make or cause to be made, or present or cause to be presented, * * * any claim upon or against the Government of the United States, * * * shall forfeit and pay to the United States the sum of $2,000." There has been some disagreement among the courts in defining the scope of the statute. A number of courts have held that liability under the Act must be predicated upon the submission of a false claim with the intent to defraud the government. *See United States v. Mead*, 426 F.2d 118, 122 (9th Cir. 1970); *United States v. Hanger One, Inc.*, 406 F.Supp. 60, 70 (N.D.Ala.1975), *rev'd on other grounds*, 563 F.2d 1155 (5th Cir. 1977); *United States v. Goldberg*, 158 F.Supp. 544 (E.D.Pa.1958). Other courts, however, including this one, have ruled that a person may violate § 231 by submitting a claim to the government knowing it to be false. *See United States v. Cooperative Grain and Supply Co.*, 476 F.2d 47, 56–58 (8th Cir. 1973); *Acme Process Equipment Co. v. United States*, 171 Ct.Cl. 324, 347 F.2d 509 (1965), *rev'd on other grounds*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 219 (1966); *United States v. Fox Lake State Bank*, 225 F.Supp. 723, 724–25 (N.D.Ill.1963). In *Cooperative Grain* the

Eighth Circuit Court carefully analyzed § 231 and concluded that the statute required a "knowing" submission of a false claim. The court defined "knowing" in a civil sense and thus reasoned that either actual knowledge or a negligent misrepresentation in submitting the claim could constitute a "knowing" submission sufficient to support a violation of § 231. In *Miller v. United States*, 213 Ct.Cl. 59, 550 F.2d 17 (1977), this court cited *Cooperative Grain* in support of the proposition that a negligent representation of a claim satisfies the knowledge requirement of § 231.

 The issue in the present case is whether Builders violated § 231 by submitting its April 30, 1969 cost estimates to the government. It is not possible to find a violation of § 231 based on the evidence that defendant adduced at trial. There is no dispute that Builders knowingly prepared the 1969 cost estimates in a manner that differed from its prior estimates. Whether by doing so Builders was negligent in representing its costs is a matter that need not be reached because the evidence does not show that the figures submitted were false. Although the unit prices on the 1969 estimate did not correspond to the figures in EGCAP's 1969 devis estimatif, the estimate did very nearly portray the actual costs of constructing the project. In addition, prior to formulating its cost estimates Builders had orally agreed with EGCAP on new bottom-line prices for the construction of each type of house. By distributing this total figure among the individual line items, Builders did not falsify the 1969 estimates. The total figure that it worked with accurately represented what it cost Builders to have EGCAP construct the houses. Although its decision to distribute its costs among the individual line items may have been somewhat misleading in light of the manner in which it prepared the prior cost estimates, the total figure that it started with was sound and, that being the case, the increased unit prices do not constitute false claims.

It is concluded that the defendant has failed to prove either a violation of 28

U.S.C. § 2514 (1976) or 31 U.S.C. § 231 (1976). It is recommended that the court conclude that plaintiff is entitled to recover on the arbitration award.

KASHIWA, Judge, concurring:

I concur with the result reached by the per curiam opinion of the majority. I wish, however, to clarify why this suit is within our jurisdiction.

Plaintiff was required by the document it signed with the government of Senegal and the Agency for International Development (AID), an agency of the United States, to submit all disputes to arbitration. A dispute was arbitrated against the United States and plaintiff brings this suit to enforce the arbitrators' monetary award.

Defendant's principal argument against suit is that 28 U.S.C. § 2517(a) (1976) precludes jurisdiction in this court if appropriated funds will not be used to pay the judgment we might enter. In particular, defendant contends Congress has never specifically appropriated public moneys to the particular AID program in which plaintiff participated. In defendant's view, that Congressional failing is sufficient to remove this dispute from our jurisdiction.

It is well settled that 28 U.S.C. § 2517(a) bars suit only where Congress has affirmatively precluded the use of appropriated funds. Whether Congress has actually appropriated funds for the particular program is thus irrelevant. *See, e.g., L'Enfant Plaza Properties, Inc. v. United States*, Ct.Cl., 668 F.2d 1211, at 1212–1213 (1982); *Convery v. United States*, 220 Ct.Cl. 106, 109–112, 597 F.2d 727, 729–730 (1979); *DeMauro Construction Corp. v. United States*, 215 Ct.Cl. 364, 375–376, 568 F.2d 1322, 1328–1329 (1978).

The statutes applicable to AID show that Congress intended the agency's expenses, presumably including adverse arbitration awards, to be paid primarily from nonappropriated moneys the agency collects as guaranty fees. *See, e.g.,* 22 U.S.C. § 2183(b). Equally clear, however, is the import of 22 U.S.C. § 2183(e), which provides:

(e) *Authorization of appropriations*

There is hereby authorized to be appropriated to the President such amounts, to remain available until expended, as may be necessary from time to time to carry out the purposes of [22 U.S.C. §§ 2181–2183].

Congress obviously thought appropriated funds might be needed to satisfy AID's expenses, and I see no reason to exclude adverse arbitration awards as an appropriate expense. *See also* 22 U.S.C. § 2395(i). It follows that 28 U.S.C. § 2517(a) does not bar plaintiff's suit to enforce the arbitrators' award.

Nothing else need be said to conclude the matter is within our jurisdiction. I therefore concur.

## CONCLUSION OF LAW

Upon the findings and foregoing opinion, which are adopted by the court, the court concludes as a matter of law that plaintiff is entitled to recover $495,898.45 plus 75 percent of the costs of arbitration, and judgment is entered to that effect with the case remanded to the trial judge pursuant to Rule 131(c)(2) for a determination of the total amount of recovery.