**NORRIS INDUSTRIES, INC.**

v.

**The UNITED STATES.**

**No. 481–78.**

United States Court of Claims.

June 16, 1982.

Andrew W. Singer, attorney of record, Washington, D. C., for plaintiff. Covington & Burling, Washington, D. C., David L. Hirsch, Columbus, Ga., R. James Shaffer, Long Beach, Cal., and Patricia A. Sullivan, Washington, D. C., of counsel.

William O. Geny, with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant. Vito J. DiPietro, Washington, D. C., of counsel.

Before COWEN, Senior Judge, DAVIS and NICHOLS, Judges.

NICHOLS, Judge:

Plaintiff brought this action under 28 U.S.C. § 1491 and 1498; the claim is such that it might sound under either section, mutually exclusive as they more usually are. Plaintiff's predecessor received government financial assistance to develop a Light Anti-Tank Assault Weapon system (hereinafter LAW) for national defense, and it agreed to license the government to make, use, and sell the invention. There were, however, qualifications to the license by which defendant agreed not to compete in plaintiff's market in certain circumstances (no-compete clauses). Plaintiff, after perfecting the invention, obtained patents that covered it. Defendant has in recent years had third parties manufacture the LAW and has sold it to friendly and allied foreign governments at cost under the Foreign Military Sales Act, a/k/a Arms Export Control Act, 22 U.S.C. § 2751–2794. In recent years, under that Act, it has been mandatory to obtain from the foreign government no less than full reimbursement. *Baggett Transportation Co. v. United States*, 670 F.2d 1011 (Ct.Cl.1982). Plaintiff does not deny that manufacture and use of the LAW for gratuitous rearmament of allied nations would be licensed, but says that sales for value breach the no-compete clauses. Thus, in one view of the case the sales are breaches of an express or implied contract (28 U.S.C. § 1491) and in another, an unlicensed infringement (28 U.S.C. § 1498). In either view, the claim turns on interpretation of the no-compete clauses. As we construe the clauses, these foreign sales are not breaches of any contract and are not unlicensed, therefore, the choice of a statutory consent to the suit is not necessary and is not made.

I

One threshold issue is easily disposed of. Defendant says we have no jurisdiction, citing 28 U.S.C. § 2517. While that Act simply says that judgments of this court are paid from appropriated funds, it is often cited as the "nonappropriated funds exclusion" from our statutory consent to suit. We have recently considered two instances where projects were funded by other than direct appropriation, and determined that for the exclusion to be effective, there must be "a clear expression by Congress that the agency was to be separated from general federal revenues." *L'Enfant Plaza Properties, Inc. v. United States*, 668 F.2d 1211, 1212 (Ct.Cl.1982); *McCarthy v. United States*, 670 F.2d 996 (Ct.Cl.1982). Foreign military sales are held not excluded from § 1498 coverage in *Hughes Aircraft Co. v. United States*, 209 Ct.Cl. 446, 534 F.2d 889 (1976). The Act, 22 U.S.C. § 2771, as it was during all relevant periods, authorized funds to be appropriated for its purposes, and this is the very thing which, in the other cases, was held to negative any intent to separate the agency from federal revenues. This issue, therefore, is not considered further and we proceed to take up the merits.

II

Defendant moves for partial summary judgment and plaintiff cross-moves. There is no issue of relevant fact. The motions do not apply to Count III of the second amended petition, which pleads a breach by defendant of various supply contracts under which it procured LAW system components from plaintiff and resold them to foreign countries. Our decision will not dispose of Count III, which presents a distinct issue, and our disposition of Counts I and II need not await resolution of Count III.

The patents are Nos. 3,122,059, 3,138,064, 3,182,553, 3,209,693, 3,256,777, 3,279,072, and 3,168,866. Upon their issuance, licenses were granted to defendant which incorporated restrictions on competition. For the full text of all the restrictions alleged, one must look at the R&D contracts awarded plaintiff's predecessor. The licenses are signed by the inventors and grant the usual rights; irrevocable, nonexclusive, nontransferable, and royalty-free. The first R&D contract was awarded February 28, 1958,

No. DA–19–020–ORD–4601 (hereinafter Contract 4601) for design, development, and fabrication of the LAW system. The contractor was Hesse—Eastern Division of Flightex Fabrics, Inc., of Everett, Massachusetts, but Norris Industries, Inc., the present plaintiff, has owned the Hesse—Eastern Division since 1964.

The original patent rights article of Contract 4601 contained the usual governmental nonexclusive, royalty-free license to practice or cause to be practiced the inventions throughout the world. It ended as follows:

> No license granted herein shall convey any right to the Government to manufacture, have manufactured, or use any Subject Invention for the purpose of providing services or supplies to the general public in competition with the Contractor or the Contractor's commercial licensees in the licensed fields.

From time to time, as the Armed Services Procurement Regulations (ASPR) changed, corresponding changes were sent to Hesse—Eastern Division to modify this patent rights article, which is a standard article which has at all times been a source of concern to government lawyers. Mod. 28, October 1960, inserted the following immediately before the language above-quoted:

> Such license includes the practice of Subject Invention in the manufacture, use, and disposition of any article or material, in the use of any method, or in the performance of any service acquired by or for the Government or with funds derived through the Mutual Security Program of the Government or otherwise through the Government.

And then Mod. 32 on July 26, 1961, added after the language first above-quoted:

> * * * [B]ut provided, however, that the restriction of this sentences, shall not be applicable in respect to any services or supplies which the Government has hitherto or may hereafter provide as a governmental function pertaining to the general public health, safety, or welfare.

The licenses, though dated after Mod. 32, and on government forms, did not contain either in text, or by summary, or by incorporation by reference, the provisions of either Mod. 28 or 32. It does not appear, however, that these licenses were intended to abandon or waive the rights, whatever they were, that inured to the government by virtue of Mods. 28 and 32.

Some of the licenses refer to the government's rights under Contract 4601, others to government rights under Contract DA–19–020–ORD–5352. This was a contract entered into by Hesse—Eastern Division to develop and improve the LAW, dated December 9, 1960. By the date of Contract 5352, the basic design and development of the LAW was substantially complete. The provisos added to the patent rights clause in Contract 4601 were also added to Contract 5352. Charles B. Weeks, coinventor of the LAW and president of Hesse—Eastern Division at the pertinent time, states by affidavit that he did not believe Mod. 32 was intended to apply to inventions already made, and the absence of any change in the license language to him confirmed this idea. He says he was assured by government negotiators that the foreign rights were not included within the licenses, except for foreign governments whose use was U. S. Government funded under the Mutual Security program. He also says he was advised by company patent counsel in 1961 that the no-compete clause precluded the United States Government from selling to foreign customers, and Hesse—Eastern Division filed for foreign patents on the basis of this assurance.

Plaintiff asserts, and we must take it as true for purposes of summary judgment, that the LAW has no nonmilitary use and therefore no nongovernmental buyers. Thus, the term "general public" in the original clause, before modification, it is argued, cannot include anybody if it does not include governments. Similarly, by this reasoning, the term "commercial licensee" in the same clause cannot include anybody if it does not include governments. The governments of Norway and Australia are licensed under counterpart patents obtained in Norway and Australia, and have produced

LAW systems for themselves and other governments, and are "commercial licensees" according to plaintiff. But Hesse— Eastern Division's president, Mr. Weeks, was aware that Mods. 28 and 32 to Contract 4601, and corresponding Mods. to Contract 5352, were inserted because the patent rights clause was required by ASPR in military R&D contracts. There is nothing to show that all R&D contracts with like clauses were, like the ones at bar, related wholly to development of combat items. We take judicial notice that the military are not always engaged in combat. For their maintenance and logistic support, they frequently develop and procure items not for combat.

Mr. Weeks learned in 1977 that the government was obtaining LAW systems from United States producers and selling them to foreign governments under the Foreign Military Sales Act, *supra.* Foreign governments that obtain LAW systems in this manner pay the cost of procurement, but do not pay the royalty to plaintiff that they would pay if they produced at home under plaintiff's licenses as Norway and Australia do, or purchased from Norway and Australia.

Plaintiff filed a claim for royalties with the Department of Defense in 1977, and upon its denial, instituted the suit we have before us.

### III

Plaintiff construes the basic no-compete agreement, without Mods. 28 and 32, as if it were drafted entirely for plaintiff's own peculiar situation. Words such as "general public," therefore, have to be given a special meaning in order that they shall have any meaning at all. Anyone familiar with government contracting knows that the "boilerplate" or printed standard clauses frequently are put in the "bid package" and the contractor's acquiescence is required, simply because some statute or regulation says they must be there and not because they bear on the matter at hand. Being a standard clause, required by ASPR 9–107.2 (Oct. 15, 1958) (March 15, 1960) (Jan. 31, 1961), the clause might have been included in a development contract for a thermal blanket, a life raft, or a new type of Spam. Plaintiff refers, in an unrelated context, to the possibility that a "subject invention" might be a new cancer cure. Mr. Weeks was not reasonable, therefore, in supposing the clause was fashioned specially for the peculiar situation that obtained under his contracts. It was first required by ASPR in 1949 and was deleted in 1963.

The original clause, before the Mods., makes no reference to foreign sales as such, to governments or other. It would be unreasonable to suppose the framers did not have as their primary concern possible competition in the domestic market. Defendant has collected and set out for our consideration a good deal of evidence of what that impact was expected and understood to be. On the one hand, there was no reference to foreign military sales. Plaintiff concedes it never expected or contended it had not licensed gratuitous mutual security transactions royalty-free. On the other hand, there was great concern on the part of domestic industry that the United States Government would use its patent licenses to enter domestic production and sell to the domestic public with an unfair advantage over private manufacturers who had to pay royalties. Drafts were considered and rejected which would have banned sales to "others than the United States Government."

Conceding, as defendant must, that Mr. Weeks was entitled to give any reasonable construction to government-drafted contract clauses that could reasonably have more than one construction, we think it is doubtful whether Mr. Weeks was required to be aware of all this material. Analogies between legislative history and administrative history, in the search for light in construing statutes and ASPR clauses, respectively, may be helpful up to a point, but cannot be carried too far. The information given lends credibility to an interpretation only if the contract language clearly supports it. Leaving all that aside, it is reasonable to ask one's self, however, who as a

matter of ordinary speech would construe "providing services or supplies to the general public in competition with the contractor" as including gifts or sales to foreign governments. The word "general" means in ordinary speech as in "caviar to the general," *i.e.*, the ordinary people who lack the special sophistication to enjoy caviar or the means to become accustomed to it. We think "general public" is a smaller community than "public" and what is excluded is what might be called a "special" public, purchasers with special requirements such as governments have.

The no-compete clause does not speak of sales. It speaks of *"providing"* licensed articles to the "general public." It would appear that Mr. Weeks, construing the clause as he did, would have at once asked where the language distinguished between "providing" gratuitously, and "providing" for consideration, and yet he always was aware the former was not covered by the no-compete clause. The government needed license protection against liability for foreign military assistance transactions, which made use of patented inventions. See discussion and history in *Hughes Aircraft, supra.* To impute to defendant an intention to protect itself in case of gratuitous assistance only is a somewhat arbitrary assumption requiring more support in fact than Mr. Weeks was in possession of. The government would have put itself in a strange position to exonerate itself from infringement liability in case of purchases for its own arsenal, but to mollify its own inventors with royalties to be passed on to foreign allies in cases of foreign military sales. Surely foreign governments would expect the United States Government to exploit its license rights to the same extent in the two cases, and be much aggrieved if this did not occur.

And who is not to be competed with? Not just licensees, but "commercial licensees." So there must be a category of noncommercial licensees who are not to be protected. And who are noncommercial licensees if not governments? To assume otherwise without evidence was unreasonable.

Mod. 28 expressly includes in the license articles, methods, services, etc., acquired "with funds derived through the Mutual Security Program." The plain import of this is that the terms of the nonexclusive royalty-free license to practice the invention "by or for the United States" includes practice financed with Mutual Security funds. A modification or amendment of the no-compete provision is not intended, as shown by the fact that the latter is left to follow the language inserted by Mod. 28. That language is itself modified or qualified by the no-compete provision which follows it in the arrangement.

Finally, the Mod. 32 or "public health, safety or welfare" amendment we are told by plaintiff was proposed to the ASPR Committee in 1960 in response to congressional concern that the no-compete clause might prevent the government from making available to the general public some vitally important discovery such as a new cancer cure. This is more of the dubious "legislative history" that defendant also relies on, but as with defendant's history, it does lend some authenticity to what otherwise might appear the undisciplined speculations of counsel. It tends to explain the language used and to reassure that the plain and obvious meaning was the meaning intended. This Mod. 32, unlike Mod. 28, follows the no-compete clause and is clearly intended to qualify it. While it is possible to argue that the clause relates to national defense through Mutual Security, a more natural meaning is to refer it to what precedes this insert, and to say that some sales to the "general public" competing with "commercial licensees" are after all licensed to the government. It removes a part of the more general prohibition of the no-compete clause. A limited construction of "health, safety, and welfare" as referring to nondefense functions and as not including arming of this nation and its allies in this context makes more sense. The authors of Mod. 32 were too sophisticated not to know that what is a "governmental function" is the subject of endless dispute. The clause, being meant as a placebo for congressional

critics, deals with a contingency not expected to arise, and so did not need to define its terms with precision. It follows that Mod. 32 is without bearing on the instant controversy.

■ Our conclusion, therefore, is that the Mutual Security Amendment (Mod. 28) does not modify the no-compete clause, *i.e.*, it does not authorize competition otherwise unlicensed under the no-compete clause if it is for Mutual Security. Mod. 32, the Public Health, Safety, and Welfare Amendment, has no bearing on the instant controversy, being meant for a different ·purpose. Therefore, the original no-compete clause stands alone, not relevantly modified. It does not exclude from the licenses the contract here under attack, because it prohibits no more than sales to the "general public" which does not include vendee governments, and sales in competition with "commercial licensees," which does not include licensed governments.

### IV

This analysis moots the plaintiff's arguments about retroactivity of Mods. 28 and 32, and also its point that the court should attach some meaning—because Mr. Weeks did—to the absence of reference to Mods. 28 and 32 in the various licenses on government-prescribed forms, executed later than the Mods. The arguments of the parties are voluminous and cover a wide range of issues; we have considered them all and find nothing in them to affect the above considerations significantly.

Accordingly, defendant's motion for partial summary judgment is granted, plaintiff's cross-motion for partial summary judgment is denied, and Counts I and II of the amended petition are dismissed.

DAVIS, Judge, concurring:

I join in the court's opinion, but I add that, in my view, though the "Mutual Security Program" clause did not modify the "no compete" clause, it did and does shed significant light on the original meaning of that clause and should be affirmatively taken into account in construing that clause.

To me, the "Mutual Security Program" provision makes crystal clear the original meaning of the license given to the Government.