KELLAM, Senior District Judge.
The decision of the Armed Services Board of Contract Appeals (Board), ASBCA 24913, awarding General Electric Company the right to an adjustment in the price of aircraft engines delivered for foreign military sales, is affirmed.
BACKGROUND
The United States Air Force (Air Force) contracted with General Electric Company for the supply of jet engines destined for foreign military sales (FMS), pursuant to the Arms Export Control Act, 22 U.S.C. § 2751 et seq. and subsequent sections. In accordance with the statutes and regulations, contractors, including General Electric, were required to negotiate annual advance agreements establishing ceilings for the recovery of independent research and development (IR & D) and bid and proposal (B & P) costs. Funds for IR & D and B & P costs were unavailable, absent an advance agreement.[1] Such advance agreement was provided for under P.L. 91-441 which provided that no payment for IR & D or B & P costs could be made to any company for which an advance agreement was required, “except pursuant to the terms of that agreement.” P.L. 91-441, § 203(a)(3), 84 Stat. 905. U.S.Code Cong, and Adm.News 1970, Volume 1, page 1055. Contractors disputed the applicability of such restrictions to FMS. In keeping with this requirement and in an effort to protect against overceiling IR & D and B & P costs, the subject contracts with General Electric, and other contracts with other contractors, at the insistence of the contractors, included a provision that if it was finally determined by the Department of Defense (DOD) that FMS contracts were not subject to the ceiling limitations, then the allocation of contractors’ IR & D and B & P expenditures would not be limited by the advance agreement. Because the parties were aware that some change in the DOD policy concerning the treatment of IR & D and B & P costs might occur during the term of the contract, General Electric negotiated a savings clause in its 1978 and 1979 contracts. The language in each contract was similar. For the purposes of this opinion, we set out in the footnote the language from the 1978 contract.[2]
In October 1978, DOD revised its regulations exempting FMS contracts from IR & D and B & P ceilings. Subsequently, General Electric submitted its claim for payment of overceiling IR & D and B & P costs allocable to its FMS contracts. The contracting officer denied this claim on the ground that the change was only applicable to new contracts entered into after the date of the change in the regulations. On appeal the ASBCA held that the savings clause was triggered by the change in policy when the DOD determined that P.L. 91-441 was not applicable to FMS contracts and General Electric was therefore entitled to recover its actual IR & D and B & P costs.
The government’s appeal raises the issue of jurisdiction and whether the findings are based on substantial evidence.
*1565 so as to provide more flexibility by allowing the Reserve representation on such boards to be established by regulation ....
*1569 OPINION
I.
The government’s challenge to jurisdiction is two pronged. First, it says ASBCA could not enter judgment against the United States under a non-appropriated fund contract, and secondly, the claim was not properly certified when submitted to the contracting officer. These issues will be dealt with separately, and in reverse order.
A.
The ASBCA decision contains the following Finding of Fact:
129. By letter to ASD dated 13 November 1979, signed and certified by Mr. Ta-marro, GE submitted and requested a contracting officer’s decision on its claim for payment of overceiling IR & D/B & P costs allowable to FMS procurements under the captioned contracts. The total amount claimed for FMS engines delivered in both 1978 and 1979 was $3,512,-774. GE’s claim was received by the contracting officer on or about Friday, 16 November 1979 (GR4, tab A-5).
In its reply brief the government for the first time raises the issue that ASBCA was without jurisdiction to entertain the appeal because General Electric failed to properly certify the claim submitted to the contracting officer.
The Contract Disputes Act of 1978 became effective November 1, 1978, and applied to contracts entered into 120 days after November 1, 1978, with the right of the contractor to elect to proceed under the Act with respect to any claim pending before the contracting officer or initiated thereafter. 41 U.S.C. § 601 and subsequent sections. All claims by a contractor against the government relating to a contract are subject to decision of the contracting officer. 41 U.S.C. § 605(a). Pursuant to 41 U.S.C. § 605, the claim must be in writing and where for more than $50,000.00, as in the case here, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that “the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.” 41 U.S.C. § 605(c)(1). (Emphasis added)
The government argues that GE’s certification statement of November 13, 1979, fails to state the amount of its claim and fails to include the above-quoted words, particularly the belief in the government’s liability. GE argues that the government’s position is formalistic and that when the November 13, 1979 statement is read in its entirety, including referenced documents, the statutory requirements are satisfied. We agree. The government’s view that the certification statement requires a claimant to swear to a belief in a legal theory of recovery is meritless.
The November 13, 1979 statement began with the words “Claim for Payments ... listed the contracts for which IR & D and B & P costs were sought; made reference to other correspondence; enclosed a statement of the overceiling costs for 1978 and 1979 allocable to the subject contracts; and set forth that pursuant to the Contract Disputes Act of 1978, contractor requested a final decision from the contracting officer regarding the claim; that the cost comprised what was generally described as ov-erceiling IR & D and B & P costs allocable to FMS engines and enclosed a summary of the costs sought; that the claim was made in accordance with the contractual agreement which provided for an equitable adjustment by reason of the DOD policy change; that it believed it was entitled to the adjustment; it certified the claim was made in good faith and the supporting data was accurate and complete to the best of signer’s knowledge and belief. This document, with attachments, contains the information and statements required by the statute and is in substantial compliance therewith. The contracting officer and ASBCA thus acquired jurisdiction.
B.
The government next attacks the jurisdiction of the Board on the grounds it is without jurisdiction to enter a money judgment against the United States under a *1570 non-appropriated fund contract. The Contract Disputes Act, unless otherwise specifically provided, applies to any express or implied contract entered into by an executive agency for the procurement of property, other than real property in being. 41 U.S.C. § 602. Under 41 U.S.C. § 605, all claims by a contractor against the government relating to a contract shall be submitted to the contracting officer for a decision. The contractor has the right of appeal from the decision of the contracting officer to the Agency Board of Contract Appeals, 41 U.S.C. § 606, and from the Board to this court. 41 U.S.C. § 607. See also 28 U.S.C. § 1295(a)(10).
United States, acting through the Air Force, entered into a contract with General Electric by which United States was to acquire military supplies for sale to a foreign government under the Arms Export Control Act. The government and General Electric were the only parties to the contract. The two parties negotiated and agreed upon the terms and conditions of the contract. The government controlled the performance and payment under the contract. No provision or condition of the contract made payment subject to receipt of funds from a foreign country, or any other source.
The non-appropriated funds doctrine, as it has developed judicially, was based on 28 U.S.C. § 2517, as previously enacted, which required that judgments of the Court of Claims be paid only from appropriated funds. Surprisingly, the government makes only passing reference to this section.[3] Well it should not, for that section was amended in 1978 making it subject to the provisions of the Contract Disputes Act of 1978. Nothing in the Contract Disputes Act of 1978 limits its application to appropriated funds. Considering the reach and range of the Tucker Act and the Contract Disputes Act, any preclusion must be expressed. The classification of funds as “appropriated” has been read broadly, and exclusions narrowly. The non-appropriated funds doctrine applies only if the activity was “specifically intended to operate without using appropriated funds.” Hughes Aircraft Co. v. United States, 534 F.2d 889, 907, 209 Ct.Cl. 446 (1976).
Congress contemplated that sales under the Arms Export Control Act would be at no cost to the government. It also contemplated payment should be provided to the contractor. Pursuant to the Act, the foreign government could be required to deposit money in a trust fund, which would be used to pay the contractor. In lieu of the deposit, the purchaser could provide the United States with a dependable undertaking to pay. Under circumstances set forth in the statute, the President had authority to provide for payment within 120 days after billing. It seems clear from the Arms Export Control Act that Congress did not intend that the rights of the contractor should be affected by 28 U.S.C. § 2517 and the non-appropriated funds doctrine. A predecessor of this Court made clear in L’Enfant Plaza Properties, Inc. v. United States, 668 F.2d 1211, 229 Ct.Cl. 278 (1982) and in McCarthy v. United States, 670 F.2d 996, 229 Ct.Cl. 361 (1982), that the non-appropriated funds exclusion is limited to instances when, by law, appropriated funds not only are not used to fund the agency, but could not be. It is clear that the Air Force and Department of Defense have authority to use appropriated funds to the extent appropriated, and “that is sufficient to avoid the non-appropriated funds exclusion.” McCarthy, supra, 670 F.2d at 1002. Congress provided in the Arms Export Control Act, 22 U.S.C. § 2762:
(a) Except as otherwise provided in this section, the President may, without requirement for charge to any appropriation or contract authorization otherwise provided, enter into contracts for the procurement of defense articles or defense services for sale ... to any foreign country ... if such country ... provides the United States government with a depend *1571 able undertaking (1) to pay the full amount of such contract ... (2) to make funds available in such amounts ... as may be required to meet the payments required by the contract, and any damages and costs that may accrue.... ******
(b) The President may ... issue letters of offer ... which provide for ... payment within one hundred and twenty days after the date of billing....
The Act further authorizes the President “to finance procurements of defense articles ... and design and construction services ... on terms requiring the payment to the United States ... of (1) the value of such articles ... within a period not to exceed twelve years...” 22 U.S.C. § 2763, and with interest. Pursuant to 22 U.S.C. § 2764, the President may guarantee any individual or corporation doing business in the United States against political and credit risk of nonpayment arising out of their financing of credit sales of defense articles and service, and to charge a fee for such guarantee. 22 U.S.C. § 2769 provides that the President may sell design and construction services to any eligible foreign country if such country agrees to pay not less than the full cost to the United States government in advance of the performance of such services, and may, without requirement for charge to any appropriation or contract authorization enter into contracts for the procurement of design and construction services for sale. It is difficult to understand how the government can argue that judgment cannot be entered in this case because funds have not been appropriated, for 22 U.S.C. § 2771 says:
(a) There is hereby authorized to be appropriated to the President to carry out this Act not to exceed $800,000,000 for the fiscal year 1982....[4]
* * * * * *
Unobligated balances of funds made available pursuant to this section are hereby authorized to be continued available by appropriations legislation to carry out this Act.
In addition, pursuant to 22 U.S.C. § 2795, under direction of the President and in consultation with the Secretary of State, the Secretary of Defense “shall establish a Special Defense Acquisition Fund ... to be used as a revolving fund, separate from other accounts ... to finance the acquisition of defense articles ... in anticipation of their transfer pursuant to this Act ... to eligible foreign countries.” Under subsection (b) of that section, the Fund shall consist of, among other funds, collections from sales made under letters of offer issued pursuant to 22 U.S.C. § 2761(a)(1) of the Act, and other sources therein described.
Further, 41 U.S.C. § 612, titled “Appropriations” provides:
(a) Any judgment against the United States on a claim under this Act shall be paid promptly in accordance with the procedures provided by ... 31 U.S.C. § 724a.
(b) Any monetary award to a contractor by an Agency Board of Contract Appeals shall be paid promptly in accordance with the procedures contained in subsection (a) above.
(c) Payments made pursuant to subsection (a) and (b) shall be reimbursed to the fund provided by section 31 U.S.C. § 724a by the agency whose appropriations were used for the contract out of available funds or by obtaining additional appropriations for such purposes.
Title 31 U.S.C. § 724a[5] was reenacted and is now 31 U.S.C. § 1304. It is titled Judgments, Awards and Compromise Settlements. It provides:
(a) Necessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs *1572 specified in the judgments or otherwise authorized by law, when
(1) Payment is not otherwise provided for;
(3) the judgment, award or settlement is payable
(c) under a decision of a board of contract appeals.
The government’s contentions are in complete conflict with the terms of the Act, and prior decisions of this Court, and are without merit.
II.
Lastly, the government asserts the decision of ASBCA is not supported by substantial evidence. Substantial evidence “means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).” Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); Brewer v. United States Postal Service, 647 F.2d 1093, 1096, 227 Ct.Cl. 276 (1981), cert. denied, 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982).
So far as this case is concerned, in an appeal from ASBCA, its findings on any question of fact shall be final and conclusive and shall not be set aside unless, as is asserted here, such decision is not supported by substantial evidence. 41 U.S.C. § 609(b). ASBCA filed a thorough opinion with lengthy discussion of the evidence and exhibits, and made specific findings. The government’s challenge to the sufficiency of the evidence is rooted in the contention the Board’s finding that (1) the “savings clause” in the contracts permitted recovery of overceiling of IR & D and B & P costs for all engines delivered in 1978 and 1979 is erroneous, (2) that the language of the savings clause gave General Electric advantages other contractors did not have; and (3) the contracting officer did not have authority to include such a clause in the contract.
The government argues that neither party understood how the savings clause would operate. Such argument disregards the facts. The Air Force had used such a clause for a number of years previously. In 1975 it used such a clause in a contract with McDonnell, and such a clause was included in the advance agreement with McDonnell executed in June 1976. The clause used was developed by the Air Force Systems Command (AFSC) tri-service negotiation group to provide for equity should there be a change in DOD policy. It had the approval of AFSC legal counsel. Thereafter substantially identical savings clauses were included in numerous negotiated advance agreements. It was not a spur of the moment act, or one done without lengthy discussions. The tri-service negotiators were aware of the fact that the Army negotiated agreements containing similar clauses. The record establishes considerable discussions between General Electric and the Air Force on the issue. Numerous drafts were presented of the language proposed to be used before agreement was reached. To suggest that Air Force negotiators and General Electric did not understand how the clause would operate is to disregard the evidence. If the Air Force negotiators did not understand the clause, why did it reject some of the drafts and request and agree to others? The Air Force negotiators were well aware that General Electric would not agree to change the proposal to price all 1978 FMS engine deliveries at the ceiling rate until Air Force agreed to include a savings clause in the pricing modification. General Electric furnished a set of calculations on how the prices would be revised if the ceiling was not applied to FMS work. Further, the Air Force negotiator discussed certain of the proposals with the tri-service negotiators. The discussions set out in the record make it clear the Air Force negotiators well understood that the savings clause would allow General Electric to recover ov-erceiling IR & D on all 1978 FMS engine deliveries if DOD policy was changed. In fact, the Air Force negotiator urged inclusion in the clause in the 1978 contract the language that any price adjustment would *1573 be subject to available funds, and limited to J79 engines. General Electric agreed. In fact, the language of availability of funds was suggested by the Air Force negotiator after he had discussed the question of including a savings clause with AFSC and learned that a savings clause could be used, although AFSC preferred it not be used.
The interpretation of the language of the clause was discussed in detail between the Air Force and General Electric during which General Electric made its interpretation of the language clear. Before the 1979 savings clause was agreed upon, General Electric again had made its position and interpretation of the language clear. At that time, it advised the Air Force that pursuant to the 1978 clause, it would be seeking in excess of a million dollars of overceiling IR & D.
ASBCA agreed that General Electric’s interpretation of the clause was correct and that the proper interpretation was that upon the change in the DOD policy, all FMS engines delivered under the 1978 and 1979 contracts would be eligible for the equitable adjustment. The record supports such a finding.
Though the government argues that the Air Force officials lacked authority to agree upon a savings clause and particularly a clause which could be interpreted as permitting adjustment of contract prices back to a period prior to the implementation of the policy change upon which the adjustment depended, it points to no statute or regulation prohibiting such an agreement. ASBCA found there was no such statute or regulation. Even if it be agreed there was a policy of the agency against such provision, it “is not the equivalent of legislation or of a formally-promulgated regulation,” and even if “the contracting officer ... did depart from the policy” ... he was “not acting illegally or bereft of authority.” Lockheed Aircraft Corp. v. United States, 426 F.2d 322, 327, 192 Ct.Cl. 36 (1970). Nor has the government cited any regulation making IR & D or B & P costs unallowable or restricting a contracting officer from including a savings clause that would operate as the clause in issue does.
The findings of ASBCA, being supported by substantial evidence, its decision is affirmed.
AFFIRMED.

. The contracts were fixed-price-redetermina-ble contracts, providing for prospective price redetermination at a stated time or times during performance in accordance with regulations. The contracts ordered a quantity of engines at prices established on the basis of a quantity range for engines predicted to be delivered in a given calendar year, the prices to be redetermined annually in accordance with the terms, conditions and regulations provided therefor.

. It is recognized that the contractor’s proposed ceiling level, rather than expenditure level, on IR & D and B & P for FMS cases is reflected in the negotiated prices for CY1978 scheduled/delivered engines. In the event DOD policy is changed allowing the excess overceiling recovery on FMS cases, the contractor will be granted an equitable price adjustment to J79 FMS engines based on the increase in allowable costs (i.e., difference between ceiling and expenditure levels) subject to availability of funds.

. This was the basis of the government’s contention in Hughes Aircraft Co. v. United States, 534 F.2d 889, 209 Ct.Cl. 446 (1976).

. The amount for fiscal 1978 was $682,000,000 and $674,300,000 for fiscal 1979.

. Prior to reenactment in 1982, 31 U.S.C. § 724a provided “There are appropriated, out of money in the Treasury not otherwise appropriated, such sums as may be necessary for the payment, not otherwise provided for; ... of final judgments, awards and compromise settlements, which are payable in accordance with . . . decisions of boards of contract appeals.”