**LAKEVIEW CONSTRUCTION CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 488–89C.**

United States Claims Court.

Aug. 23, 1990.

---

Robert C. Baumgarten, San Diego, Cal., with whom was G. Wayne Murphy, Los Angeles, Cal., for plaintiff.

Sharon Y. Eubanks, with whom were Asst. Attys. Gen. Stuart M. Gerson and David M. Cohen, Washington, D.C. (Valerie Stewart, Office of the Gen. Counsel, Dept. of the Navy, of counsel), for defendant.

### OPINION

BRUGGINK, Judge.

Once again the court is faced with the question of whether a complaint should be dismissed, not for lack of merit, but for failure to comply with certification requirements of the Contract Disputes Act, 41 U.S.C. §§ 601–13 (1988) ("CDA"). The case arises out of a written contract entered into between plaintiff Lakeview Construction Co. ("Lakeview") and the United States, acting through the Department of the Navy, for the repair of certain buildings at Camp Pendletón Marine Corps Base. Defendant has moved pursuant to RUSCC 12(b)(1) for dismissal of the action. It contends that subject matter jurisdiction is absent because the plaintiff's claim did not satisfy the certification and submission requirements of Section 6 of the CDA. 41 U.S.C. § 605(a), (c)(1). The matter has been fully briefed and orally argued. For the reasons expressed herein, the motion is granted.

### I. FACTUAL BACKGROUND [1]

Lakeview recites in its complaint that during the course of performance, it performed certain change order work at the Navy's request. For each of the 22 modifications to the contract brought about by those change orders, Lakeview reserved its right to claim impact and delay costs. It is those claimed impact and delay costs that are the subject of this action. The issue is whether the paperwork submitted in connection with those costs satisfies the requirements of the CDA.

On July 17, 1987, Lakeview submitted a thirteen page letter, with attachments,

signed by Robert C. Baumgarten, counsel for Lakeview. Attached to the letter is a certification by Robert F. Fuller, Sr., President of Lakeview. The letter is addressed to the Resident Officer in Charge of Construction ("ROICC"), not the Contracting Officer ("CO"). Nowhere in the letter does counsel for Lakeview demand a decision from the CO. The letter contains the following information on the first page:

Subject: Delay and Impact Claim

Documents
Transmitted: Volume I: Claim Narrative
Volume II: Exhibits 1–49 including CPM As–Builts Standard Form 1411

The body of the letter begins with an extensive description of events. It then sets forth five categories of costs, both in a narrative fashion and in terms of an itemized breakdown of expenses. The last page of the letter includes the following information:

#### SUMMARY

| | | |
|---|---|---:|
| I. | Inefficiency Costs | $ 705,477.92 |
| II. | Extended Overhead | $ 768,133.16 |
| III. | Approved–Unissued Changes | $ 55,599.00 |
| IV. | Balance Owing on Prime Contract | $ 45,478.00 |
| V. | Subcontractor Claims | $ 159,413.07 |
| | TOTAL CLAIM | $1,734,101.15 |

.... Accordingly, please expeditiously review this *proposal* at all appropriate levels.... Below is the Certification of this *proposal* by the Contractor as required by the Contract Disputes Act. (Emphasis added.)

On September 10, 1987, R.L. Schultz, the Deputy ROICC at Camp Pendleton, wrote Lakeview a letter with respect to the July 17 document. It recites, in relevant part, the following:

We have received and are reviewing the request submitted by your consul [sic], enclosure (1), in your behalf for additional compensation and time for completion for work performed under the subject contract. As there is not, or never has been any question of entitle-

1. The facts are drawn from the complaint and the parties' submissions on the motion. There are no material facts in dispute.

ment to an equitable adjustment to the contract for delay and impact costs, we are processing your request as a request for change order not as a claim per the Disputes Clause of your contract. The only question being one of quantum of adjustment.

There is additional information required to allow a fair assessment of your requests by the ROICC....

The letter concludes with a number of specific requests for information or documentation.

On November 16, 1987, counsel for Lakeview responded by letter to the Navy's letter of September 10. The stated subject of the letter is, once again, the "Claim of Lakeview Construction." Throughout Lakeview's response, the letter of July 17 is referred to as a claim. After responding on an item-by-item basis to the requests for additional information, the letter concludes:

In summary, I hope that the information provided by this letter is informative and responsive to your requests. Since by your correspondence you have identified the issue in this claim as one of quantum, I believe that much progress in establishing that figure can be established through a well conducted audit, and I encourage you to take all necessary steps to immediately initiate that procedure.

The November 16 letter did not take issue with the Navy's position that the July 17 letter would not be treated as a claim. The Navy conducted an audit and issued a report on October 7, 1988. The report questioned approximately one million dollars of the more than $1.7 million sought in the July 17, 1987 letter. On December 1, 1988, representatives of the parties met, at which time Lakeview was presented with an "as-built" schedule prepared by the Navy. Lakeview was further requested to explain the asserted delays identified on the schedule.

On January 20, 1989, counsel for Lakeview wrote the Navy a response to the questions raised during the December 1 meeting and in the as-built schedule. The letter refers to the July 17 materials as "Lakeview's 17 July, 1987 Cost Proposal." In the context of one of the costs claimed by Lakeview, the fees for the law firm of Corona & Prager, the January 20 letter makes the following statement:

During the course of the 1 December meeting, comment was made that this line item cost may be, in part, related to the preparation or pursuit of a *claim* against the Government: this is not an accurate assessment. At the time that the firm of Corona and Prager was retained, and continuing to this day, the dialogue and working relationship with the Navy has been open and productive to the extent that it has always been the position of Lakeview that a settlement will be amicably reached with the Government. As stated earlier, a Contracting Officer's Final Decision has neither been requested nor issued; likewise *no unreasonable offer has been made to Lakeview so as to constitute a dispute. There has never been, therefore, a circumstance to warrant the incurring of costs incident to preparation and/or prosecution of a claim against the Government.* (Emphasis added.)

The letter discussed other items as to which the parties had not reached agreement, and closed with a request for a complete copy of the government audit for the expressed purpose of pointing out factual errors. The letter also referenced an analysis prepared for Lakeview as a response to the Government's as-built schedule. The parties had previously exchanged computer diskettes with the information reflected in the schedule.

On March 21, 1989, Baumgarten wrote a letter addressed to the ROICC. The letter attached a "Best and Final Offer for settlement of [Lakeview's] cost proposal for impact and delay." In the letter, plaintiff requested a final decision by the CO. The decision was requested with respect to both the best and final offer enclosed and the "certified delay and impact claim dated July 17, 1987." The amount sought was $1,975,661. Within the text of the offer, the July 17 submission is referred to as "the original proposal." The offer was cer-

tified in the following fashion by the President of Lakeview, Robert F. Fuller:

> Pursuant to the CDA of 1978 this is to certify that, to the best of my knowledge and belief and in good faith, the cost and pricing data (as defined in section 15.801 of the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.804–2) submitted, either actually or by specific identification in writing, to the contracting officer or the contracting officer's representative in support of the Best and Final Proposal for Delays and Impacts arising under Contract No. n62474–83–C–5215 are accurate, complete and current as of 28 February 1989, and that the amount accurately reflects the contract adjustment for which the Contractor believes the Government is liable.

On or about June 6, 1989, Lakeview received a unilateral modification from the Navy for $258,413.64. The modification, signed by the CO, Dennis B. Wilkens, states on page two:

> This unilateral modification provides for all government caused delays/impacts from date of contract award.... This consideration encompasses the contractor's *claim* of 17 July 1987. (Emphasis added.)

The CO has not issued a final decision on any of Lakeview's submissions. Lakeview filed its complaint here on September 6, 1989.

## II. DISCUSSION

The complaint can be dismissed only if neither the July 17, 1987 letter nor the March 21, 1989 offer constitute properly certified and submitted claims. If either submission satisfies the requirements of the CDA, the court has jurisdiction.[2] Section 6 of the CDA establishes certain elements necessary to a proper claim. Insofar as relevant here, there are three distinct requirements in order for a claim to be proper. First, the claim must be in writing. Second, claims in excess of $50,-000 must be certified. Third, the claim

must be "submitted to the contracting officer for a decision." This language has been construed to mean that the contractor must demand or assert the legal right to a stated amount of money. *See Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1395 (Fed.Cir.1987); *Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586, 592–93 (Fed.Cir.1987). It must be clear that a decision is requested from the CO, as distinguished from a response to a proposal, which is an invitation to negotiate. *See Mingus,* 812 F.2d at 1395; *Hoffman Constr. Co. v. United States,* 7 Cl.Ct. 518, 525 (1985).

Defendant claims that both submissions are defective because they were sent to the ROICC, rather than to the CO. Second, it contends that the July 17 letter is a proposal for settlement rather than a claim demanding payment. Third, defendant argues that the March 21 offer did not use the certification language required by the CDA. *See* 41 U.S.C. § 605(c)(1). Each issue will be discussed separately with regard to both the July 17, 1987 and the March 21, 1989 submissions.

### A. *The July 17, 1987 Letter.*

■ The initial issue is whether the July 17, 1987 letter constitutes a claim or is merely a proposal. If the July 17 letter is a settlement proposal rather than a claim, it is not necessary to address, as to this submission, whether or not the letter was addressed to the wrong person. Regarding certification, the Government does not contend that the certification language used with respect to this letter is defective. The court concludes, for the following reasons, that the document in question was not a claim.

The CDA does not define the term "claim." The applicable Federal Acquisition Regulation ("FAR"), however, defines "claim" as follows:

> "Claim," ... means a written demand or written assertion by one of the contracting parties seeking, as a matter of

2. If the only proper certification was the March 21 submission, there would be implications, however, for calculation of statutory interest. *See* 41 U.S.C. § 611.

right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract.... However, a written demand or written assertion by the contractor seeking payment of money exceeding $50,000 is not a claim under the Contract Disputes Act of 1978 until certified as required by the Act....

48 C.F.R. § 33.201 (1988).

A proposal, as distinguished from a claim, is viewed as an invitation to negotiate. After a proposal is submitted, parties are in "pre-dispute" posture. *Mayfair Construction Co. v. United States*, 841 F.2d 1576, 1577 (Fed.Cir.1988), *cert. denied*, 488 U.S. 980, 109 S.Ct. 528, 102 L.Ed.2d 560 (1988).

A survey of the numerous documents exchanged by the parties discloses an ambiguity concerning the use of the terms "claim" and "proposal." Both parties used these words interchangeably in describing the July 17 letter. The court is reluctant, therefore, to place great weight on the parties' characterizations. The court must look to the documents and subsequent actions in order to determine if the July 17 letter was a proposal or a claim.

Plaintiff asserts that the July 17, 1987 document was indeed a valid claim and provided the Government with a "clear and unequivocal statement" of Lakeview's demand. *See Contract Cleaning Maintenance*, 811 F.2d at 592. Lakeview is correct that the July 17 letter has some earmarks of a claim. It uses the word "claim," and discusses with particularity specific cost items for which it is clearly seeking reimbursement. In addition, Lakeview attached a certification. The letter also characterizes contacts between the parties in the two years within the initial letter as fact-finding sessions, not negotiations. Furthermore, the plaintiff points to the fact that the June 2 unilateral modification, signed by the CO, refers to the July 17, 1987 letter as the "contractor's claim." The indicia that this document was never intended to be a claim nor treated as a claim are much greater, however.

Initially, the court notes that a CO decision was never requested, and the letter is addressed to the ROICC. Even if those factors are not treated as conclusive flaws, they do tend to show plaintiff's intention in submitting the July 17 letter. Also, the plaintiff failed to challenge the Government's comment that it would be treating the July 17 letter as a request for a change order and not a claim. Numerous documents were exchanged by the parties, and Lakeview had ample time and opportunity to make its intentions clear. This omission leads the court to believe that plaintiff's intention was to begin a negotiation period, not a dispute. Subsequent actions by the plaintiff are consistent with this view.

The most telling point against plaintiff is the January 20, 1989 letter sent to the Government. In this letter, counsel for Lakeview flatly denied that Lakeview had ever submitted a claim: "There has never been, therefore, a circumstance to warrant the incurring of costs incident to preparation and/or prosecution of a claim against the government." The letter emphasizes that it had always been Lakeview's position that a settlement would be reached through negotiation. Given other ambiguities engendered by the July 17 letter, the court is strongly persuaded by plaintiff's own statement that "At no time during the course of performance or since the submission of its cost proposal, has a Contracting Officer's Final Decision been requested or made regarding the cost proposal; by fact and law, therefore a dispute cannot exist." In short, this document reveals that the July 17 submission was never intended to be a claim.

Finally, it is important to note that the January 20 submission accurately states that a CO's final decision was never requested, as required by the CDA. The very existence of the March 21 letter labeled "Best and Final Offer" suggests that the July 17 letter was never intended to be a claim. For these reasons, the July 17 submission must be treated as a proposal, not a claim.

B. *The March 21, 1989 letter.*

Defendant argues that the March 21 "Contractor's Best and Final Offer" does not contain a valid certification as required by Section 6(c) of the CDA,[3] and was not submitted to the CO as required by Section 6(a).[4] The court concludes, for the following reasons, that although the offer was properly certified, it fails to satisfy the CDA because it was not submitted to the CO.

■ The March 21 certification recites the three required elements of a CDA certification: (1) the claim is made in good faith; (2) the supporting data are accurate and complete to the best of the contractor's knowledge and belief; and (3) the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable. It also includes a reference to Federal Acquisition Regulation ("FAR") 15.801 and FAR 15.-804–2. Defendant contends that such a reference amounts to a qualification on certification, rendering it invalid under *United States v. Turner Construction Co.,* 827 F.2d 1554, 1559 (Fed.Cir.1987). The court believes that defendant's reliance on *Turner* is misplaced because the certification in that case was unlike the one at bar.

*Turner* involved a prime contractor's certification of a subcontractor's claim against the Government. Under the terms of the prime contractor's contract, Turner was required to simultaneously provide the Government with information necessary to resolve the dispute or to defend against the claim and to certify its own subcontractor's claim. In accordance with its contractual obligation, Turner submitted a certification to the CO stating the following:

> Since the claimant [Johnson] is the real party in interest and is the only one who can logically and realistically certify the claim, Turner hereby submits this certifi-

cation in satisfaction of the requirements of the Act. Since Turner is not the real party in interest, Turner must accept and rely on the certification at face value. In addition, Turner is not aware of any reason which suggests that Johnson has knowingly or intentionally failed to comply with the requirements of the Act or is acting in bad faith.

*Id.* at 1557. The CO notified Turner that this was an "ineffective qualified" certification, and hence did not meet statutory requirements. Apparently, the Federal Circuit agreed with that assessment. *See id.* at 1561.

The certification in *Turner* failed to certify that the supporting data was accurate and complete to the best of the contractor's knowledge and belief, nor did the contractor certify that the amount requested accurately reflected the contract adjustment for which the contractor believed the Government was liable. Moreover, the language of the certification deferred to the reliability of the subcontractor entirely. The prime contractor made no representations on its own behalf. The reference to the FAR in the Lakeview submission is in no way analogous to the deferral of responsibility contained in the *Turner* certification.

Defendant argues that the reference to the FAR renders the certification invalid, citing *ReCon Paving v. United States,* 745 F.2d 34 (Fed.Cir.1984). The certification in *ReCon* recites:

> This is to certify that to the best of my knowledge and belief, cost or pricing data as defined in ASPR 3–807.1(a)(1) submitted, either actually or by specific identification [sic] in writing (see ASPR 3–807.3(a)) to the Contracting Officer or his representative in support of Contract # F28609–81–C–0032 claim dated January 14, 1982 are accurate, complete and current as of January 14, 1982. This

---

3. For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

41 U.S.C. § 605(c)(1).

4. "All claims by a contractor against the government relating to a contract ... shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a).

certification includes the cost or pricing data supporting any advance agreement(s) and forward pricing rate agreements between the offeror and the Government which are part of the proposal.

*Id.* at 37.

The certification did not recite, per Section 6, that the claim was made in good faith or that the amount requested accurately reflected the contract adjustment for which the contractor believed the government was liable.

The reasoning behind the court's decision in *ReCon* is not clear. Defendant cites *ReCon* for the general proposition that a certificate of current cost or pricing data does not meet CDA certification requirements. This court declines to interpret *ReCon* so broadly and relies on the material differences between the two certifications to explain the Federal Circuit's decision.

A narrow reading of *ReCon* is consistent with the case law concerning CDA certification, which has declined to take an overly formalistic approach. *See United States v. General Electric Corp.*, 727 F.2d 1567, 1569 (Fed.Cir.1984). *General Electric* held that when a certification is read "in its entirety, including referenced documents, the statutory requirements are satisfied." *Id.* The March 21 certification, containing all three requirements, easily passes this test. Moreover, there is no explicit requirement to "precisely parrot the words of the statute." Rather, the contractor must clearly, unequivocally, and simultaneously state all three required elements. *Aeronetics Division, AAR Brooks & Perkins Corp. v. United States*, 12 Cl.Ct. 132, 135 (1987). The March 21 certification passes this test as well. The requirements are clearly and simultaneously stated, and the reference to the FAR does not negate this fact. Thus, we find the March 21 certification valid.

█ The second issue concerns the requirement that the claim be submitted to the CO for final decision. The March 21 offer was mailed to the ROICC, rather than to the CO. Defendant argues that the claim should, therefore, be dismissed under *West Coast General Corporation v. United States*, 19 Cl.Ct. 98 (1989). In *West Coast General*, the court held that correspondence to the ROICC could not substitute for submission of a claim to the CO. *West Coast General* is particularly apposite because it involved the same agency and facility. Despite the fact that the CO received the claim and issued a decision, the court strictly construed the statutory requirement and dismissed the complaint.

As did the plaintiff in *West Coast General*, Lakeview contends that, even if the ROICC was not the appropriate party to whom to send the claim, the CO must in fact have received the claim because he was fully aware of the claim and was present at many of the fact-finding sessions. Because that issue was clearly articulated during oral argument, plaintiff was afforded an additional opportunity to document its assertions, as well as to support the contention that responsibility for administering claims had been delegated to the ROICC. In response to that opportunity, plaintiff filed its brief of June 22, 1990. Before considering the documents and arguments incorporated in that brief, it is worth noting what is not included. There is no affidavit or other proof concerning the CO's involvement in conversations about the March 21 claim. The CO's reference in the June 2, 1989 unilateral modification is to the July 17, 1987 proposal, not the March claim. Moreover, there is no contract-specific documentation concerning the CO's alleged practice of delegating duties to the ROICC.

The only evidence plaintiff adduces that the claim of March 21 actually reached the CO is a letter dated August 23, 1989 written at the direction of the ROICC. It is addressed to counsel for plaintiff and concerns the contract at issue. It recites that "Pursuant to our discussion of last week I am forwarding your claim to the Contracting Officer for a final decision. He will advise you when a decision can be expected." Presumably this letter refers to the March 21 claim. The court agrees with plaintiff that this document is strong evidence that the claim was sent to the CO

after August 23, 1989. It is even stronger evidence, however, that it was not sent to the CO before that time. The complaint was filed on September 6, 1989, less than sixty days after the earliest date on which the claim could have been sent to the CO. No final decision was ever issued by the CO. This letter leads the court to conclude that, even if the claim is treated as submitted to the CO through the ROICC, the complaint was premature. *See* 41 U.S.C. § 605(c)(5).

It is unnecessary, therefore, to decide whether, contrary to *West Coast General,* proof of receipt of a claim by the CO would satisfy the CDA requirement of "submission." The court notes, however, that it is *receipt* of the claim which activates the CO's obligations under the CDA, as well the running of interest. *See* 41 U.S.C. §§ 605(c)(1), 611. A decision of this court issued after the close of briefing bears directly on the question. *American Pacific Roofing Co. v. United States,* 21 Cl.Ct. 265 (1990), also involved a contract with the Navy, apparently also in the San Diego area. A motion to dismiss was filed in that case on the ground that the claim had been sent to the ROICC rather than the CO. The motion was denied. The court distinguished *West Coast General* on the basis of the ambiguous nature of the claim in the earlier case. The court in *American Pacific Roofing* held that the term "submitted" in the CDA can embrace the idea of delivery through an intermediary. The implicit holding is that the critical issue is whether the claim reached the CO. In that sense, the holdings of the two cases are probably incompatible.

In the final analysis, therefore, even if the court were to follow the holding of *American Pacific Roofing,* the result would be the same. If receipt by the CO is determinative, it is the contractor who must bear the risk of non-transmission of a claim if it uses an intermediary not designated by the contract, by regulation, or by the CO. In the case at bar, the court finds that there is no proof of receipt by the CO at least sixty days prior to commencement of suit. This finding then focuses the court on the primary argument made by

plaintiff, that submission to the ROICC was the same thing as submission to the CO.

The first sentence of Section 6(a) states that "All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). The contract in this case designates as CO "the Commander, Naval Facilities Engineering Command." As to all matters other than disputes, the Officer in Charge of Construction is designated as the authorized representative of the CO. With respect to the disputes clause, "the Contracting Officer shall mean the Commander, Naval Facilities Engineering Command, the Acting Commander, their successors, or their representatives specially designated for this purpose." The contract thus creates the possibility that, for purposes of filing a claim under the disputes clause, the CO could have designated someone to act as CO in his stead. The ROICC, to whom the claim is addressed, however, is not authorized by this section of the contract to act as the CO on disputes matters, absent specific designation.

Despite the statutory language, and the absence of any contract indication of delegation of authority to the ROICC to act on disputes, plaintiff has two remaining arguments. First, it points to internal agency instructions, "WESTNAVFACENGCOM INSTRUCTION 4365.1F" (hereafter "Instruction 4365.1F"), in which procedures are described for processing claims within the Western Division of the Naval Facilities Engineering Command. The instructions are dated July 31, 1989. *Inter alia,* they define and assign tasks to two individuals, the Administrative Contracting Officer ("ACO") and the Procuring Contracting Officer ("PCO"). Plaintiff did not have access to these instructions during contract performance, but rather obtained them through a Freedom of Information Act request.

The PCO is defined as the "individual responsible for awarding contracts to whom ACO's must report disputes arising under the contract and through whom the

ACO must process claims packages." The ACO is the "individual responsible for the interpretation and enforcement of the terms and conditions of a contract and who has the authority to direct the Contractor to perform work that he/she finds to be within the scope of the contract." Paragraph 6 of the instructions, referred to as "Policy," begins with the statement that "Upon receipt of a claim, the ACO shall immediately notify Contract Terminations and Claims Branch...." The Contract Terminations and Claims Branch is described in paragraph 7 as "responsible for managing claim processing and the Head thereof is authorized to issue final decisions of the Contracting Officer up to $500,000.00...." The ACO is obligated to date stamp the claim upon receipt. The ACO is not permitted, under the policy, to deny a claim. If the ACO believes there is no entitlement, the claim is to be forwarded for a "final decision of the Contracting Officer," presumably the PCO.

Attached to Instruction 4365.1F is a "WESTDIV Standard Format for Forwarding Claim." It plainly contemplates, as plaintiff contends, that claims received by the ACO are to be forwarded to the PCO.

The plaintiff also offers excerpts from the "ROICC Manual," a document prepared by the Western Division headquarters. The excerpt furnished bears no date, but does incorporate the "policy guidance" on claims provided in Instruction 4365.1. It is not clear if that is the same as Instruction 4365.1F. As to general procedures, the Manual repeats the relevant statutory provisions. As a matter of "Policy," it then recites that the "ROICC shall make the initial determination as to merit on any request for equitable adjustment from a contractor or A–E. When differences cannot be resolved at the ROICC level, the contractor's written demand for a final decision of the Contracting Officer shall be processed in a timely manner to WESTDIV (Code O2C)."

There are two links missing in Lakeview's analysis. The first is that there is no indication that the ACO and the ROICC are the same position or, in this case, that those positions were held by the same individual. The parties have furnished the court with only brief excerpts from the contract documents. Paragraph 66 includes the language quoted above defining the responsibilities of the CO and his designees. There is no reference to an ACO. Supervision and general direction of the work was delegated to the OICC. Disputes could only be handled by the CO in the absence of a special designation. There was no special designation. There is no basis in the record to conclude that Lt. Comdr. Ken Rado, the ROICC/OICC, was the ACO.

The second gap concerns the role of the ROICC. It is true that a fair reading of Instruction 4365.1F and the ROICC Manual is that claims sent to the ACO or the ROICC must be forwarded for action to the CO. A number of problems arise, however. First, as defendant points out, Instruction 4365.1F is dated after the March 21 claim. The Manual, which appears to incorporate it, is undated. Second, these documents are internal policy guidance, not circulated to contractors and not required to be included in the contract. Third, although it may be unfair to critically evaluate the Instruction and the Manual when only pieces are furnished, there are apparent, although perhaps not real, inconsistencies between the two documents. It is certainly less than clear how the various functions and obligations are distributed.

In the final analysis, the court is left with a very clear statutory mandate. The claim must be submitted to the CO. There is no proof that it got to the CO during the appropriate time period to sustain jurisdiction. Although the claim clearly reached the ROICC, the contract draws a clear distinction between the CO and the ROICC particularly with respect to disputes resolution authority. Moreover, the ROICC was not authorized to receive claims.

The net result of the court's holding is that the complaint must be dismissed. The effort expended on this dismissal is particularly unfortunate given the facts that the CO apparently received the claim shortly after August 1989 and that the ROICC

expressed the view, on September 10, 1987, that "there is not, or never has been any question of entitlement to an equitable adjustment." The court trusts that the parties can cooperate to promptly determine whether and when the claim was received and proceed to consider its merits.

### III. CONCLUSION

Neither the July 17, 1987 nor the March 21, 1989 letter give the court jurisdiction pursuant to the CDA. The Clerk is directed to grant the motion to dismiss for lack of subject matter jurisdiction. Dismissal is without prejudice to timely refiling. The Clerk is directed to waive filing fees on refiling.

No costs.